# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| CREDIT SUISSE SECURITIES (USA) LLC, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-19-1470 |
| | § | |
| NEAL DAVID CARLSON, | § | |
| | § | |
| *Respondent*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court are (1) a petition to confirm an arbitration award (Dkt. 1) filed by petitioner Credit Suisse Securities (USA) LLC ("CSS"); and (2) a motion to vacate an arbitration award (Dkt. 9) filed by respondent Neal David Carlson. Having considered the petition, motion, responses, replies, and applicable law, the court is of the opinion that the motion to vacate (Dkt. 9) should be DENIED and the petition to confirm (Dkt. 1) should be GRANTED.

## I. BACKGROUND

On April 15, 2019, a three-arbitrator panel in a FINRA Dispute Resolution ("FINRA") arbitration between Carlson and CSS rendered an award in favor of CSS. Dkt. 1; Dkt. 1-1 (award). Carlson alleged in the arbitration that CSS made false representations to induce him into joining its wealth management division and failed to disclose that CSS was in the process of eliminating the division Carlson joined. Dkt. 1-1. CSS made a counterclaim for breach of contract, among other claims, alleging that Carlson was obligated to pay the outstanding balance of a promissary note he had entered into with CSS when he took the position. *Id.* The panel denied Carlson's claims and found that he was liable to CSS for the remaining balance of the promissary note together with interest. *Id.*

The presiding chairperson in the FINRA arbitration was Brian James Tagtmeier.  *Id.*
Tagtmeier had represented to the parties that he had no professional relationships with any of the
parties, counsel, or arbitrators, "no matter how remote."[1]  Dkt. 15; Dkt. 13-20 (oath of arbitrator).
It appears that this was true at the time the arbitration was filed and Tagtmeier was selected in March
of 2017.  *See* Dkt. 14-2.  However, the arbitration did not occur until March of 2019.  *See id.*  On
December 17, 2018, Tagtmeier filed a notice of appearance in a case captioned *Hestia Complete
Home Services d/b/a Hestia Home Services v. Daniel Bonville and Christine Parisien*.  Dkt.3-4.
Tagtmeier's appearance was on behalf of the plaintiff, Hestia Home Services.  *Id.*  The defendants,
Bonville and Parisien, were represented by Courtney E. Palm of Hoover Slovacek, LLP.  *See id.*  On
December 31, 2018, Carlson's team electronically filed a notice with the FINRA[2] arbitration panel
that they were changing firms and that Hoover Slovacek, LLP would now be representing Carlson.
Dkt. 13-19 (Meyer Aff.).  Three days later, on January 3, 2019, Tagtmeier filed a motion to
reconsider in *Hestia* in which he requests that the court vacate an order granting summary judgment
in Hoover Slovacek's client's favor.  Dkt. 13-5.  On February 27, 2019, Tagtmeier was listed as
counsel for the plaintiff in an agreed motion for continuance (signed by another attorney) that was
filed in *Hestia*, which represented his agreement with opposing counsel at Hoover Slovacek, and he
also signed several orders to appear in the arbitration that had been requested by Hoover Slovacek
attorneys.  Dkts. 13-7, 13-8.  When the arbitration began on March 4, 2019, Tagtmeier announced
he had no new disclosures.  Dkt. 13-19.  The *Hestia* case was still ongoing.  *Id.*

---

[1]  The first item on the checklist Tagtmeier completed personal indicates that he did not have
any "professional, social, or other relationships or interactions with counsel for any of the parties in
this arbitration *or their law firms*."  Dkt. 13-20 at 4 (emphasis added).

[2]  FINRA stands for Financial Industry Regulatory Authority.  *See* Dkt. 13-16.

2

Carlson argues that the court should vacate the arbitration award because Tagtmeier failed to disclose his ongoing representation of an adversary to an client of Carlson's counsel's firm, which Carlson contends is ground for vacatur under the Federal Arbitration Act ("FAA"). Dkt. 13. He additionally argues that some of Tagtmeier's evidentiary rulings are evidence of his partiality and that they are also independent grounds for vacatur. *Id.*

CSS argues that the court should confirm the award, as the parties agreed to final and binding arbitration and Carlson cannot meet the heavy burden of satisfying the extraordinarily narrow statutory grounds necessary for vacatur. Dkt. 14. CSS asserts that Carlson's evidence of partiality is remote, uncertain, or speculative and fails to show clearly evident bias. *Id.* CSS further argues that none of Carlson's evidentiary arguments exhibits misconduct by Tagtmeier or the panel. *Id.*

## II. LEGAL STANDARD

The FAA reflects "a liberal federal policy favoring arbitration . . . and the fundamental principle that arbitration is a matter of contract. *AT&T Mobility v. Concepcion*, 563 U.S. 333, 339, 131 S. Ct. 1740 (2011). If a party seeks confirmation of an arbitration award within one year of it being awarded, "the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of [the FAA]." 9 U.S.C. § 9. Carlson requests vacatur under subsections 10(a)(2) and 10(a)(3). Subsection 10(a)(2) permits vacatur "where there is evident partiality or corruption in the arbitrators, or either of them," and subsection 10(a)(3) permits vacatur "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(2)–(3).

The Fifth Circuit, in considering the statutory language of subsection 10(a)(2), noted that it "seems to require upholding arbitral awards unless bias was clearly evident in the decisionmakers."

*Positive Software Sols., Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 281 (5th Cir. 2007). After considering the terms of the subsection and relevant U.S. Supreme Court caselaw, the Fifth Circuit determined that "nondisclosure alone does not require vacatur of an arbitral award for evident partiality"; instead, the "arbitrator's failure to disclose must involve a significant compromising connection to the parties." *Id.* at 282–83. The "award may not be vacated because of a trivial or insubstantial prior relationship between the arbitrator and the parties to the proceeding." *Id.* at 283. The court concluded that neither the FAA nor the U.S. Supreme Court "countenances vacatur of FAA arbitral awards for nondisclosure by an arbitrator unless it creates a concrete, not speculative impression of bias." *Id.* at 286.

The arguments Carlson makes under subsection 10(a)(3) relate to alleged failure by the arbitrators to hear pertinent evidence or other misbehavior. In analyzing these claims, the court must be mindful that "arbitration resolves disputes without confinement to many of the procedural and evidentiary strictures that protect the integrity of formal trials." *Forsythe Int'l, S.A. v. Gibbs Oil Co. of Tex.*, 915 F.2d 1017, 1022 (5th Cir. 1990). While an arbitration panel is not required to hear all evidence offered, it "'must give each of the parties to the dispute an adequate opportunity to present its evidence and arguments.'" *Id.* at 1023 (quoting *Hoteles Condado Beach v. Union de Tronquistas Local 901*, 763 F.2d 34, 39 (1st Cir. 1985)). However, arbitrators "'need not follow all the niceties observed by the federal courts'"; they simply must "'grant the parties a fundamentally fair hearing.'" *Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.*, 607 F.2d 649, 651 (5th Cir. 1979) (quoting *Bell Aerospace Co. v. Div. of Textron, Inc. v. Local 516, UAW*, 500 F.2d 921, 923 (2d Cir. 1974)); *see also Laws v. Morgan Stanley Dean Witter*, 452 F.3d 398, 399 (5th Cir. 2006) ("'To constitute misconduct requiring vacatur of an award, an error in the arbitrator's determination must be one that is not simply an error of law, but which so affects the rights of a party that it may be said that he was

4

deprived of a fair hearing.'" (quoting *El Dorado Sch. Dist. No. 15 v. Cont'l Cas. Co.*, 247 F.3d 843, 848 (8th Cir. 2001))).  "Arbitrators have broad discretion to make evidentiary decisions."  *Int'l Chem. Workers Union v. Columbian Chems. Co.*, 331 F.3d 491, 497 (5th Cir. 2003).

## III. ANALYSIS

### A.  Subsection 10(a)(2) - Evident Partiality

Carlson's arguments primarily center around his allegations of evident partiality, so the court will begin its analysis there.  The court must determine in accordance with *Positive Software Solutions* whether the undisclosed connection was "a significant compromising connection to the parties" that created a "concrete, not speculative impression of bias" or if it was "a trivial or insubstantial prior relationship."  It is clear that unlike the relationship in *Positive Software Solutions*, this relationship was not a *prior* relationship.  The arbitrator had a professional relationship as an adversary with the firm representing one of the parties while the arbitration was ongoing.  The court, however, must determine whether the relationship otherwise meets the *Positive Software Solutions* standard by determining if it was significant and created a concrete impression of bias.

Carlson, relying on Texas state caselaw, including *Burlington Northern Railroad Co. v. Tuco Inc.*, 960 S.W.2d 629 (Tex. 1997), and on the U.S. Supreme Court case, *Commonwealth Coatings Corp. v. Continental Casualty Co.*, argues that the court need only determine if there was a "reasonable impression of bias."  Dkt. 17.  However, in *Positive Software Solutions*, the Fifth Circuit, in an *en banc* opinion, determined that the "reasonable impression of bias" standard in *Commonwealth Coatings* must be read "holistically" and "interpreted practically rather than with utmost rigor" as a majority of the *Commonwealth Coatings* Court did not endorse the "appearance

of bias" standard that was set forth in the plurality opinion.[3]  *Positive Software Sols.*, 476 F.3d at 282–83 (relying on reasoning in cases from the Sixth, Fourth, Second, Seventh, Tenth, and Eleventh Circuits).  The Fifth Circuit's practical and holistic interpretation requires a showing of "a significant compromising connection" and "a concrete, not speculative impression of bias" in a failure to disclose case.  *Id.* at 283, 286.

CSS thus attempts to minimize Tagtmeier's connection to the parties, noting that Tagtmeier "briefly represented a party in a Texas state court action, where the attorney for the adverse party in that action happened to be a partner at the law firm that Carlson's counsel joined two months prior to the arbitration hearings."  Dkt. 14 at 7.  It also points out that for the first twenty-two months of the proceedings, there was "no conflict whatsoever," as Carlson's counsel was at a different firm. *Id.* at 8.  CSS contends that there is no reason to believe that Tagtmeier even saw and registered in his mind that Carlson's counsel had changed firms and that counsel was now at his opposing counsel's firm in the *Hestia* lawsuit or even that he had an obligation to disclose "such a tenuous circumstance."  *Id.* at 9–10.  CSS deems the connection with Carlson's counsel's new firm to be an "insubstantial connection from which to infer partiality."  *Id.*  It points out that in *Positive Software Solutions* the Fifth Circuit clearly stated that the standard is not the mere appearance of bias and

---

[3]  Judge Reavley, joined by Judge Wiener, Garza, Benavides, and Stewart, dissented, stating that the Fifth Circuit "may not overrule a decision of the Supreme Court"—*Commonwealth Coatings*, which Judge Reavley interpreted as requiring disclosure if there are "dealings that might create only an impression of possible bias."  476 F.3d at 287 (Reavley, J., dissenting).  He noted that *Commonwealth Coatings* had "not been well received by some of the circuit courts" and that the majority's holding "might be on a bit firmer ground . . . [i]f circuit courts could overrule the Supreme Court."  *Id.*  Judge Reavley disagreed with those courts that treated *Commonwealth Coatings* as a plurality or plurality-plus opinion because he believed that the concurrence was not inconsistent with the majority opinion.  *Id.* at 288.  This court, or course, cannot overrule a Fifth Circuit opinion and must follow the majority's interpretation of *Commonweath Coatings*.  Thus, to the extent the Texas caselaw and language from *Commonwealth Coatings* relied upon by Carlson runs contrary to the *Positive Software Solutions* majority's interpretation of the Supreme Court's holding, it is inapposite.

argues that Carlson must produce "'"specific facts that indicate improper motives on the part of the arbitrator."'" *Id.* at 8 (quoting *Vantage Deep Water Co. v. Petrobras Am. Inc.*, No 4:18-CV-02246, 2019 WL 2161037, at *4 (S.D. Tex. May 17, 2019) (Bennett, J.) (quoting *Thomas Kinkade Co. v. White*, 711 F.3d 719, 724 (6th Cir. 2013)).

The Fifth Circuit has required, post-*Positive Software Solutions*, that the party requesting vacatur "'must produce specific facts from which a reasonable person would have to conclude that the arbitrator was partial to'" the other party. *Cooper v. WestEnd Capital Mgmt., L.L.C.*, 832 F.3d 534, 545 (5th Cir. 2016) (quoting *Householder Grp. v. Caughran*, 354 F. App'x 848, 852 (5th Cir. 2009)). It also requires the alleged partiality be "'direct, definite, and capable of demonstration rather than remote, uncertain, or speculative.'" *Id.* (quoting *Householder Grp.*, 354 F. App'x at 852).

Here, Carlson arguably has shown that the undisclosed and ongoing relationship with Carlson's counsel's new firm creates an appearance of bias, which would be sufficient to vacate the award under the *dissent* in *Positive Solutions* or under the Texas cases cited by Carlson, but it is not sufficient to show that a reasonable person "would *have to conclude* that the arbitrator was partial." *Cooper*, 832 F.3d at 545. The facts that Carlson contend support a finding of evident partiality are (1) Tagtmeier was representing a client in the *Hestia* lawsuit who sought to recover at least $25,000; (2) the adverse party in the *Hestia* lawsuit—represented by Carlson's counsel's firm, Hoover Slovacek—sought at least $25,000 in fees and anticipated an additional $50,000 in fees if it proceeded to trial and $20,000 for an appeal; (3) Tagtmeier wrote a motion to reconsider an order granting partial summary judgment in *Hestia* on January 3, 2019, which was three days after Carlson's counsel told the arbitration panel they had joined Hoover Slovacek; (4) Tagtmeier signed several orders in the arbitration on February 27, 2019 that had been requested by Hoover Slovacek; (5) on the same day, an agreed motion for continuance bearing Tagtmeier's signature block and

7

signed by a Hoover Slovacek attorney was filed in *Hestia*; and (6) Carlson's legal team made an argument regarding the Sherman Antitrust Act during the arbitration hearing, and Tagtmeier's opposing counsel in *Hestia* primarily practices antitrust and employment law, which could have led Tagtmeier to conclude that his opposing counsel developed this theory for the arbitration even though she was not listed counsel. Dkt. 13. Carlson further contends that Tagtmeier's adverse evidentiary rulings demonstrate evident partiality, including (1) the denial of Carlson's motion to compel material discovery; (2) the refusal to permit Carlson's experts to testify that the alleged promissory note was not a loan and confining their testimony to tax treatment of the funds; and (3) the refusal to permit CSS's Vice President of Human Resources ("HRVP") to testify about a Department of Justice publication ("DOJ Publication") directed at human resources professionals. *Id.*

CSS argues that Carlson's allegations of partiality are remote and speculative and that the facts Carlson outlines as supporting improper motives do not meet the *Positive Software Solutions* standard. Dkt. 14. CSS agrees that Tagtmeier filed a notice of appearance in the *Hestia* matter on December 17, 2018, which was before the arbitration hearing, and that the lawyer for the defendants in that matter, Courtney Palm, worked for Hoover Slovacek. *Id.* It concedes that Tagtmeier filed a motion for reconsideration or new trial in *Hestia* three days after Carlson's counsel filed a notice of substitution indicating that they were now with the Hoover Slovacek firm, but CSS argues that these facts do not provide reason to conclude that Tagtmeier even saw and registered that Carlson's counsel had changed firms, made the connection it was the same firm as his adversary in *Hestia*, or, even if he did, thought that such a "tenuous circumstance" obligated him to disclose the connection. *Id.* It also points out that Tagtmeier was only brought into the *Hestia* matter on December 17, so there is no reason to speculate that he harbored ill will or enmity towards opposing

8

counsel in the *Hestia* case. *Id.* As far as the motion for continuance being filed on the same day that Tagtmeier signed some orders in the arbitration, CSS argues that the motion was filed by opposing counsel in *Hestia* and signed by Tagtmeier's co-counsel, not Tagtmeier, and there is "no reason to speculate that Tagtmeier at that point even pieced together in his mind that his opposing counsel in *Hestia* was at the same firm as Carlson's counsel. *Id.* CSS asserts that the speculation that Tagtmeier may have thought his opposing counsel in *Hestia* came up with the Sherman Antitrust argument is "preposterous." *Id.* CSS points out that Tagtmeier is an experienced arbitrator and that his disclosures were extensive. *Id.* It argues that Tagtmeier was diligent and updated his disclosures at least four times while the arbitration was pending. *Id.* Finally, CSS asserts that the arbitration panel was composed of *three* members and issued an *unanimous* award, so the result of the arbitration would not have changed even if Tagtmeier were biased against Carlson's counsel. *Id.*

The court finds that the answer to each of these issues lies somewhere in the middle, but, regardless, Carlson has not met the stringent burden required to overturn an arbitration award for evident partiality. The court cannot conclude that a reasonable person would *have to* conclude that the arbitration panel was partial. While a reasonable person *could* conclude that Tagtmeier was partial and that he somehow influenced the other two arbitrators, a reasonable person could also conclude that the fact that his adversary in a lawsuit that Tagtmeier had recently been pulled into was at the same firm that Carlson's counsel had recently joined is inconsequential, and the fact that the award was unanimous from all three arbitrators supports the opposite conclusion. The adverse evidentiary rulings do provide some minimal additional support for Carlson's theory, but they are not clear cut errors that are sufficient to demonstrate bias. The court does find the nondisclosure troubling and believes that it presents an appearance of bias, but the standard for overturning an arbitral award for evident partiality is more stringent than appearance of bias, and Carlson does not

9

meet his burden of a "concrete, not speculative impression of bias" under *Positive Solutions* and its progeny.  The motion to vacate, as it relates to the argument of evident partiality on the part of Tagtmeier, is therefore DENIED.

**B.      Subsection 10(a)(3) - Failure to Hear Pertinent Evidence**

The court must now turn to the argument that the court should vacate the award under subsection 10(a)(3).  The court must determine whether Carlson had a fundamentally fair hearing, keeping in mind the arbitration panel's broad discretion in evidentiary matters.  Carlson argues that the award should be vacated under subsection 10(a)(3) because (1) Tagtmeier denied Carlson's motion to compel discovery of documents regarding CSS's plans to close, sell, or transfer the private banking business in the United States, which allowed damaging testimony to be presented with no opportunity for rebuttal or impeachment; (2) Tagtmeier refused to consider expert testimony regarding the promissory note actually being compensation and instead confined Carlson's experts to discussing tax treatment of the promissory note; and (3) Tagtmeier did not allow Carlson to question CSS's HRVP about CSS's alleged violation of the Sherman Antitrust Act and FINRA Rule 2010.  Dkt. 13.  The court will consider each of these arguments in turn.

**1.      Denial of Motion to Compel**

Carlson contends that his ability to fully present his claim of fraudulent inducement was "crippled" when Tagtmeier denied his request to compel the production of material evidence. Dkt. 13.  Namely, Carlson sought to compel production of documents relating to plans to close, sell, or transfer the CSS banking business in the United States, which Carlson contends he needed to prove that CSS fraudulently induced him to leave his former firm even though CSS knew it was going to close the division he was being induced to join.  *Id.*  Carlson contends that because Tagtmeier denied the motion to compel, the only evidence he could rely on for this fraudulent

10

inducement theory was a Reuters article from January 2014 that claimed CSS had given the U.S. private wealth business eighteen months to turn around and spare the "'death sentence.'" *Id.* (quoting Dkt. 13, Ex. 11 at Carlson1117). This article was somewhat probative of the theory that CSS planned to close the private wealth management group when it hired Carlson in March 2014, but its evidentiary value was diminished when the person who was CEO of CSS's private banking division in the United States at the time testified during the hearing that the Reuters article mischaracterized and distorted a comment that the division would become profitable in eighteen months with no suggestion it would otherwise close. *Id.* (citing Dkt. 13, Ex. 12 at 1:54–58). Carlson argues that CSS's current CEO was responsible for the fate of the private wealth management group, and documents reflecting when discussions about the closure took place were needed to establish when the decision was made. *Id.* The current CEO, however, was not officially brought on board until 2015, which is long after Carlson was hired. *Id.* Nevertheless, Carlson argues that the current CEO admitted to having multiple meetings with CSS's chairman before he was hired, which Carlson appears to believe raises an inference that the current CEO was planning to close the division and had communicated those plans before he was officially hired. *Id.* Carlson points out that the Reuters article indicates that the restructuring was mapped out before the current CEO was hired. *Id.*

CSS argues that there were no plans to close the private banking business in the United States when Carlson was hired, and that, in fact, the decision was not made until the new CEO was hired in the second half of 2015 and conducted a strategic review of all of CSS's businesses. Dkt. 14. And, regardless, CSS contends that it produced hundreds of documents responsive to the discovery request for which Carlson filed the motion to compel. *Id.* Moreover, CSS notes that Carlson received a full and fair hearing during the arbitration on this issue: he questioned the CEO of CSS's

11

private banking business in the United States at the time of the publication of the Reuters article about the article and CSS's plans.  *Id.*

The court finds that the decision not to compel production did not deprive Carlson of a fair hearing.  It was within the panel's discretion to determine whether compelling production was necessary, and it was definitely within its discretion to determine whether the production provided by CSS was sufficient.  Moreover, Carlson had an opportunity to question the CEO who was in charge at the time, who indicated that the article was erroneous.  It was certainly within the panel's discretion to decide the testimony was credible.  Carlson was not deprived of a fair hearing due to the denial of the motion to compel.  The motion to vacate on this ground is DENIED.

## 2.    Limited Expert Testimony

Carlson next argues that Tagtmeier "placed handcuffs" on Carlson's experts, who would have testified that there was no bona fide loan and that Carlson therefore did not owe CSS anything. Dkt. 13.  He contends that he offered Professor Kevin Yamamoto to explain how the promissory note and corresponding monthly bonus provision established that no bona fide loan existed.  *Id.* However, CSS's counsel took the expert on voir dire at the hearing and, according to Carlson, commenced to "mischaracterize the anticipated testimony as *solely* limited to the tax treatment of this compensation scheme." *Id.* (citing Dkt. 13, Ex. 12 (MP3 file recordings) at 1:23–34).  Carlson complains that Tagtmeier stated that CSS's objections to the expert were overruled, but then he strictly limited the testimony to how the compensation would be treated for taxable purposes.  *Id.* (citing Dkt. 13, Ex. 12 at 1:50–51).  Tagtmeier limited Carlson's other expert, Lance Stodghill, in the same way—overruling CSS's objections but limiting the testimony to taxable income. *Id.* (citing Dkt. 13, Ex. 12 at 2:47–48).  Carlson relies on *Gulf Coast Industries Works Union v. Exxon Co., USA*, 70 F.3d 847, 850 (5th Cir. 1995), to support his argument that the fact that Tagtmeier overruled

12

CSS's objections but then improperly limited consideration of the testimony to tax purposes and ultimately ignored it with the award is reason to vacate the award.

CSS points out that the promissory note specifically states that if Carlson ceased to be a CSS employee, for any reason, the principal amount and interest would be immediately due and payable.[4] *Id.* (citing Dkt. 13, Ex. 14 at CS 000211–213 (the promissory note)).  CSS notes that Carlson argued that the promissory note was not a bona fide loan because the Internal Revenue Service was likely to conclude that the money paid to Carlson in 2014 was taxable income.  *Id.*  Yamamoto was offered to testify about the following:

> I would like to offer you as an expert on the subject of treatments of transactions for tax purposes whether a loan is properly characterized as a loan or some other form of income, how that plays into the IRS code or the out pool [sic], IRS provisions, IRS, you know, tax court decisions, if any that are applicable, and with respect to the Tax Advisor Memorandum, and the interplay and mechanics between the employment agreement at issue in this case with Mr. Carlson and how that operates, together with the purported promissory note and the characteristics of those two documents when they are run together as opposed to just, you know, separately.

Dkt. 14-10 (Ex. I) at 734–35.  Stodghill was offered to testify about the following:

> I would like to offer Mr. Stodghill as an expert to testify about applicable provisions of the Internal Revenue Code and IRS procedure, about the IRS's evaluation of compensation arrangements, and in particular out of the type of arrangement structured through the operation of this promissory note and employment agreement, the IRS's probably [sic] treatment based on his experience and knowledge, of this – what we believe to be income in year 2014, IRS potential penalties and consequences, in the event that this income is examined by the IRS, whether through audit or through the amendment of Mr. Carlson's taxes, as well as the procedures and

---

[4]  The Promissory Note states that Carlson "agrees to pay to the order of [CSS] . . . the principal amount," which would be made on the last day of the first payroll period of each month for 108 months.  Dkt. 13, Ex. 14 at CS 000211.  It further states that if Carlson "cease[d], for any reason, to be an employee of [CSS] or one of its affiliates, the principal amount then outstanding and accrued but unpaid interest thereon shall become immediately due and payable."  *Id.*

> potential costs and steps necessary, in the event that this ends up in
> tax court, what that might involve and the cost thereof.

Dkt. 14-10 (Ex. I) at 796–97.  CSS contends that it was reasonable for the panel to limit the expert

testimony to tax as they were experts in tax, not securities industry compensation arrangements.

Dkt. 14.  It relies on *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) and Federal Rule

of Evidence 702.  *Id.*

The court has reviewed the transcript of the voir dire and testimony of these experts.

Yamamoto is a professor at the South Texas College of Law Houston and has been there for twenty-

three years.  Dkt. 14-10 at 731.  Yamamoto has written books on estate and gift taxation and federal

tax research and has written five editions of a black letter outline about income taxation.  *Id.* at 732.

Yamamoto testified that he has never worked in the securities industry, has never been qualified as

an expert on financial industry compensation practices or industry practices in the security industry,

never been a contracts law professor and is not an expert in contract law, and is not an expert on the

enforceability of notes.  *Id.* at 736–41.  Yamamoto specifically said he was not going to offer an

opinion on the enforceability of the note and that the full extent of his opinion was when the funds

received were "income."  *Id.* at 741–42.  CSS objected to Yamamoto testifying about even the tax

treatment of the funds since the tax consequences were not determinative of whether it was a loan.

*Id.* at 742–43.  After going off the record, the arbitrators returned and said that the objection was

overruled.  However, after Yamamoto started testifying, Carlson's counsel asked if there are

situations in which a transaction may look like a bona fide loan but not be properly treated as such,

and CSS's counsel objected because Yamamoto was supposed to be opining about tax, not whether

a loan is a loan.  *Id.* at 749.  Tagtmeier pointed out that the question is not what Yamamoto said he

was going to testify about and made Carlson's counsel move on.  *Id.*  Later Tagtmeier clarified with

the witness that all of his answers were "from a taxable standpoint" to which the witness responded affirmatively. *Id.* at 750.

Similarly, Stodghill testified that he "was brought in to testify about questions about the IRS procedural aspects of what could happen in this case." *Id.* at 795. Stodghill is an attorney whose practice consists primarily of representing taxpayers in matters involving the IRS. *Id.* Stodghill also teaches a class on federal tax procedures at the South Texas College of Law Houston. *Id.* Stodghill previously worked as an attorney for the IRS for many years. *Id.* Stodghill has never worked in the securities industry and has never been qualified to be an expert before. *Id.* at 798. CSS objected to Stodghill testifying about evaluation of compensation agreements since he had no industry experience and to his testimony about the IRS probable treatment because it would be duplicative of Yamamoto's testimony. *Id.* at 802–03. CSS also objected to Stodghill testifying about penalties or consequences for not declaring the payment he received from the promissory note as income and the cost in tax court because these issues were not relevant. *Id.* at 803. The panel, after another brief recess, overruled the objection but specifically noted that, like with Yamamoto, the testimony must "be based solely upon taxable income and not on anything else . . . ." *Id.* at 806–07.

While an arbitration panel is not generally bound by all the strictures of the Federal Rules of Evidence, it is worth discussing Rule 702, which is also cited by CSS. Under Rule 702, a proposed expert must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. of Evid. 702. Federal trial courts act as gatekeepers for expert testimony, and while experts do not have to be highly qualified to testify, courts need not admit testimony that is based purely on the *ipse dixit* of the expert. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592–93, 113 S. Ct. 2786 (1993); *Gen. Elec. Co. v. Joinder*, 522 U.S. 136, 146, 118 S. Ct. 512 (1997); *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). Here, both of these experts clearly were experts in tax, not the

securities industry. Yamamoto even testified that he was only planning to testify about whether the funds were "income." Under these facts, it would not be surprising if a judge acting as a gatekeeper and enforcing the Federal Rules of Evidence were to limit the expert testimony to tax treatment.

The court will, nevertheless, consider the caselaw cited by the parties. In *Gulf Coast Industries*, during the hearing, Exxon attempted to prove up a report as a business record, but the arbitrator informed Exxon that it did not have to be proved up because it was already in evidence. 70 F.3d at 849. However, when the arbitrator issued the ruling, the arbitrator found that the report was hearsay that "did not even have the status of a business record." *Id.* (summarizing the ruling). The district court vacated the award, finding that the arbitrator had "lulled Exxon into believing" that the report was admitted and then refused to consider it. *Id.* at 849–50 (summarizing the district court's ruling). The Fifth Circuit affirmed, noting that not only did the arbitrator refuse to hear material evidence, "he prevented Exxon from presenting additional evidence by misleading it into believing [the report] had been admitted as a business record." *Id.* The Fifth Circuit held that "such conduct falls squarely within the scope of Section 10, and is grounds for vacatur." *Id.*

Here, Carlson attempts to draw parallels with *Gulf Coast* by arguing that Tagtmeier essentially lulled his counsel into believing the testimony of Carlson's experts would be allowed and then proceeded to limit the testimony. This case, however, is not on point at all. Carlson's counsel knew during the hearing that the arbitrator was limiting the scope of the testimony of his experts; the arbitrator did not come back later after it was too late for counsel to do anything about it and change the rules. While the court understands that, at least with Yamamoto, Carlson's counsel may have initially believed his expert was going to be able to testify beyond tax treatment since CSS's objection to the expert was overruled, it quickly became apparent that the arbitrator was limiting the testimony to tax treatment.

CSS cites *Owen v. Kerr-McGee Corp.* for the proposition that the arbitration panel appropriately allowed the experts to testify within their areas of expertise but did not allow them to testify about the ultimate legal issue before the panel—whether the promissory note was an enforceable loan that needed repaid. Dkt. 14. In *Owen*, the Fifth Circuit instructed that "questions which would merely allow the witness to tell the jury what result to reach are not permitted." 698 F.2d at 240. It pointed out that "allowing an expert to give his [or her] opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant." *Id.* This case is on point to the extent that the panel excluded legal opinions about whether the promissory note was an enforceable loan.

The court finds that the panel's refusal to allow the two experts' testimony to go beyond the bounds of the tax treatment of the funds Carlson received from the promissory note did not deprive Carlson of a fair hearing. These two experts had expertise in tax, not the securities industry. The motion to vacate based on this argument is DENIED.

**3.      Refusal to Allow Human Resources Testimony About a Document**

Carlson's final argument is that Tagtmeier refused to permit him to introduce evidence to support his claim that CSS violated FINRA Rule 2010.[5] Dkt. 13. Carlson sought to question CSS's HRVP about the DOJ Publication, which Carlson asserts was a publication specifically for human resources professionals. *Id.* According to Carlson, the publication indicates that sharing compensation information between competitors is contrary to the Sherman Antitrust Act and FINRA

---

[5]  FINRA Rule 2010 "requires members, in the conduct of their business, to observe high standards of commercial honor and just and equitable principles of trade. Rule 2010 protects investors and the securities industry from dishonest practices that are unfair to investors or hinder the functioning of a free and open market, even though those practices may not be illegal or violate a specific rule or regulation. Dkt. 13-16 (Financial Industry Regulatory Authority, Regulatory Notice 08-57 (Oct. 2008, effective Dec. 15, 2008)).

Rule 2010.  *Id.*  Carlson wanted to prove that CSS shared compensation information for approximately 300 of its brokers with Wells Fargo, giving Wells Fargo an undue advantage that depressed the market for Carlson's services.  *Id.*  Carlson contends that he was offered a less competitive compensation package from Wells Fargo as a result.  *Id.*  Carlson argues that he was unable to fully develop this argument through testimony during the arbitration hearing because the panel limited his ability to question the HRVP.  *Id.*  Carlson also contends that Tagtmeier refused to compel discovery of information about the compensation of similarly situated CSS employees who transitioned to Wells Fargo, which he contends further prejudiced him by cutting off the only other reasonable means of proving this theory.  *Id.*  Carlson believes that Wells Fargo obtained an anticompetitive advantage through its deal with CSS, which he contends violated the Sherman Antitrust Act, resulting in Carlson receiving a significantly lower sign-on bonus than he believes he should have received.  *Id.*  Carlson asserts that this is not a speculative argument, as the former CEO who testified at the hearing agreed that Wells Fargo's agreement with CSS placed it in a better position than its competitors to recruit CSS's financial advisors.  *Id.*  Carlson contends, however, that the "glue" he needed for this argument was the testimony of the HRVP showing that the arrangement was illegal under the Sherman Antitrust Act and a violation of FINRA Rule 2010.  *Id.*

According the Carlson, CSS did not object to the DOJ Publication as evidence during the hearing but did object to the HRVP discussing it and further asserted that an exception applied to the CSS/Wells Fargo situation.  *Id.*  Tagtmeier sustained the objection to questioning the HRVP about the document, and Carlson contends that he needed to question the HRVP about the document to show that the carve outs for mergers asserted by CSS were not applicable.  *Id.*  Carlson complains that he could possibly have used compensation data instead to show that CSS illegally shared with Wells Fargo, but Tagtmeier denied his request to compel that discovery.  *Id.*

CSS contends that it was not misconduct for the panel to disallow questioning about the DOJ Publication as Carlson did not even plead an affirmative claim for a violation of FINRA Rule 2010. Dkt. 14.  Instead, he made the argument about the alleged violation of the Sherman Antitrust Act which constituted a violation of FINRA Rule 2010 in his opening and closing statements at the hearing.  *Id.*  The DOJ Publication had not been produced during discovery, which is required under FINRA rules, but CSS did not object to the document itself, only to the questioning of the HRVP about it.  *Id.*  When Tagtmeier ruled on the objection, he stated that the panel members would read the DOJ Publication and decide what weight to give it, but he did not allow Carlson's counsel to question the HRVP about it.  *Id.*

The court has reviewed excerpts of the testimony of the HRVP.  It is clear that Carlson's counsel was able to question the HRVP about whether she learned about the risks of sharing compensation information among competitors as a possible violation of antitrust law, and she answered in the affirmative.  Dkt. 14-11 at 1192.  There were specific objections made when counsel tried to question her about legal issues because the HRVP is not a lawyer.  *See id.* at 1192–98. Carlson was, however, able to ask the HRVP if Wells Fargo was given a "leg up on the competition" when it was announced that CSS was leaving the US market, and the HRVP testified that there was an exclusive recruiting agreement with Wells Fargo so as to offer a smooth transition.  *Id.* at 1199. Thus, Carlson was not, as he contends, cut off from the only reasonable means of proving his theory. The arbitrators agreed to look at the document, Carlson's counsel was able to make his arguments, and he was able to question the HRVP about alleged anticompetitive activity.

CSS argues that the decision not to let Carlson question the HRVP about the DOJ Publication was reasonable because (1) the document is merely a statement of policy from the DOJ; (2) it was not produced during discovery; (3) the HRVP was not familiar with the document; (4) it was

admitted into evidence; (5) Carlson was only planning to read parts of the document and ask the HRVP if she agreed; (6) the HR Publication was published in October 2016, which was a year after the events in 2015 that were subject to the arbitration; and (7) even if it were published earlier, Carlson's arguments regarding the document were invalid because the arrangement CSS had with Wells Fargo was a collaboration between the two companies and appropriate precautions were taken, which is an exception in the document. *Id.* Carlson argues in response to these contentions that CSS was permitted to argue it had satisfied a safe harbor but he was not allowed to confront the HRVP with the DOJ's own guidelines, which resulted in an improper impediment to his case. Dkt. 15.

The court disagrees with Carlson's argument that Tagtmeier impeded the development of his case by not allowing him to question the HRVP about the document and not compelling discovery of the compensation data. In his closing arguments, Carlson's counsel noted that he did not plead the Sherman Antitrust Act but went on to assert that CSS gave Wells Fargo their entire book and that while the agreements may not be illegal, they may be subject to civil liabilities if they have an anticompetitive effect. Dkt. 14-15 (excerpts from closing) at 1349–50. Carlson made his arguments and the document was admitted into evidence for the arbitration panel to consider if it deemed it relevant. Of course, as CSS points out, it may not have even deemed it relevant since it was issued after the events at issue in this case.

The court finds that failing to allow Carlson to question the HRVP about this document that she was not even familiar with and had not been disclosed prior to the hearing is not an instance of the arbitrator or the panel depriving Carlson of a fair hearing. Thus, Carlson's motion to vacate based on that ruling and the failure to allow additional discovery into this unpled theory is DENIED.

**C.      Petition to Confirm**

Having denied all the grounds for vacatur, the court now turns to CSS's petition to confirm. *See* Dkt. 1.  CSS seeks a judgment that confirms the award, awards CSS costs incurred in connection with the proceedings to confirm the award, and awards pre-judgment and post-judgment interest. *Id.*  A motion to confirm an arbitration award is a summary proceeding.  *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997).  A district court's review of an arbitration award is "exceedingly deferential."  *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 380 (5th Cir. 2004).  "If an [arbitration] award is rationally inferable from the facts before the arbitrator, the award must be affirmed."  *Kergosien v. Ocean Energy, Inc.*, 390 F.3d 346, 353 (5th Cir. 2009).

Under 9 U.S.C. § 9, "at any time within one year after the award is made any party to the arbitration may apply to the court . . . for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title."  9 U.S.C. § 9.  Thus, if a party seeks confirmation of an arbitration award within one year of the award, the court must confirm the award unless notice of a motion to vacate, modify, or correct is served on the adverse party within three months of the granting of the award. 9 U.S.C. § 12.

CSS timely filed its petition to confirm the award, and Carlson has provided no valid ground for vacatur.  Accordingly, the award is CONFIRMED pursuant to 9 U.S.C. § 9.

CSS has requested post-judgment interest pursuant to 28 U.S.C. § 1961 as well as costs. Dkt. 1.  Costs may be awarded pursuant to 28 U.S.C. § 1920.  The motion for costs is GRANTED. CSS shall file a bill of costs within fourteen days of judgment as required under the Southern District

of Texas Local Rule 54.2. *See* S.D. Tex. L.R. 54.2; *see also* 28 U.S.C. § 1920 (outlining the types of costs the clerk may tax).

Finally, CSS requests an award of interest. "Interest shall be allowed on any money judgment in a civil case recovered in district court." 28 U.S.C. § 1961. Accordingly, CSS's request for interest pursuant to § 1961 is GRANTED, and CSS is AWARDED post-judgment interest as computed under that statute.

## IV. CONCLUSION

Carlson's motion to vacate the arbitration award (Dkt. 9) is DENIED. CSS's petition to confirm the award (Dkt. 1) is GRANTED and the award is CONFIRMED. CSS is also AWARDED costs under 28 U.S.C. § 1920 and post-judgment interest pursuant to 28 U.S.C. § 1961. The court will issue a final judgment concurrently with this order.

Signed at Houston, Texas on January 2, 2020.

_____
Gray H. Miller
Senior United States District Judge

22